IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

BIRTA R. FORD                                                                                              PLAINTIFF

v.                                                              CIVIL ACTION NO. 1:21-CV-13-SA-DAS

WAL-MART STORES EAST, LP and
MATTHEW WISECUP                                                                           DEFENDANTS

ORDER AND MEMORANDUM OPINION

Now before the Court is the Defendants' Motion for Summary Judgment [39]. The Motion

[39] has been fully briefed. Having reviewed the filings, as well as the applicable authorities, the

Court is prepared to rule.

*Relevant Factual and Procedural Background*

Birta R. Ford, a black female who is currently 59 years old, began working at Wal-Mart's

Louisville, Mississippi location in 1993. From 1993 until 2012, Ford worked in a variety of

different positions at the Louisville store. In 2012, the then-Store Manager, Charlie Fairley,

promoted Ford to one of the Assistant Store Manager (sometimes hereinafter referred to as

"ASM") positions at Louisville. At some point thereafter, James Jones replaced Fairley as the Store

Manager. In August 2018, Matthew Wisecup replaced Jones as the Store Manager. Mel Searcy,

who holds the position of Market Manager, made the decision to make Wisecup the Store Manager

at the Louisville store. Searcy was also Wisecup's direct supervisor. When Wisecup's tenure as

Store Manager commenced, Ford was working as an Assistant Store Manager over the overnight

shift (9:00 P.M. to 7:00 A.M.). Ford was responsible for the overnight stocking process—in

particular, she supervised the overnight stockers. Wisecup was her direct supervisor.

Wal-Mart utilizes a progressive employee discipline plan. Under the plan, there are three

different disciplinary action levels: Disciplinary Action 1 – Yellow; Disciplinary Action 2 –

Orange; and Disciplinary Action 3 – Red. Disciplinary actions remain active for a period of 12 months.[1] If an employee receives a successive disciplinary action within that 12-month period, the successive action is a level higher than the original disciplinary action. As explained by Ford, "if one does not get a second disciplinary action with a year of getting their first, then it 'falls off,' and the next disciplinary action received is considered a first (yellow). However, if one gets a second disciplinary action within a year from the first, the year starts all over again, and both will not fall off until a year after the second." [45] at p. 3.

On March 27, 2018—prior to Wisecup becoming the Store Manager—Jones issued Ford a first disciplinary action (Disciplinary Action 1 – Yellow) because Ford did not report to Wal-Mart's Ethics Department an incident regarding an associate's use of a racial slur toward another associate. Although Ford contends that she should not have received a disciplinary action for this incident because of additional facts (not relevant to this lawsuit), she admits that Wisecup was not the Store Manager at the time of the incident and that he was in no way involved in her receipt of that disciplinary action.

In late 2018—a few months after Wisecup became Store Manager—Ford's brother was involved in a severe accident and required extensive medical treatment and care. As to how her brother's situation impacted Ford's employment, the parties' versions of events diverge. According to the Defendants, Wisecup recommended to Ford that she move to the day shift "to better fit her schedule and [so] that she could remain working and getting paid instead of taking leave." [40] at p. 7. Ford agrees that Wisecup suggested that she move to the day shift but contends that Wisecup "did not work with [her], and whenever Ford had to take her brother for an

---

[1] At some point during Ford's employment, Wal-Mart internally began referring to disciplinary actions as "coachings." The Court notes this distinction for the sake of clarity, as certain quotes throughout this Order and Memorandum Opinion utilize the term "coaching" when referring to a disciplinary action. For purposes of this Order and Memorandum Opinion, this is a distinction without a difference.

appointment, it was always a problem." [45] at p. 6. Nevertheless, it is undisputed that Ford changed to the day shift and was eventually moved to the position of Assistant Store Manager over the front end of the store.

In February 2019, Wisecup issued a disciplinary action to Ford. Because this disciplinary action was issued within one year of Ford's previously-noted disciplinary action, it was labeled as a Disciplinary Action 2 – Orange. Wisecup's notation supporting the disciplinary action was as follows:

> On 2/18/19, Birta was the closing manager on duty. Birta was on the candy aisle at 6:30 pm stocking candy and was not following up to store standards. No one was assigned to fill water or the drink aisle. Paper goods was [sic] not filled. Lunches were not planned on the GM side of the store leaving no coverage during this time.

[39], Ex. 5 at p. 1.

After receiving this disciplinary action, Ford reached out to Searcy pursuant to Wal-Mart's Open Door Policy. Searcy came to the Louisville store to meet with Ford. According to Ford, she told Searcy during that meeting that she believed Wisecup was trying to get her fired. Ford admits that she did not reference race or age during that meeting.

A few days later, Wisecup gave Ford a poor annual performance review. On the Competencies/Capabilities section of the performance review, Wisecup issued Ford a "Development Needed" rating (2 out of a scale of 5) in three subsections: (1) Grow the Business; (2) Inspire and Motivate; and (3) Operate with Discipline. In the "Manager's Comments" portion of the evaluation, Wisecup commented:

> Birta works well with her associates and has a great deal of total store knowledge. Birta needs to improve her planning so she is able to better manage her day and achieve the desired results each day, each week, and each month. Birta tries to do too much on her own at times and this affects her ability to follow-up. Birta needs to continue to grow her process knowledge especially around

3

> technology. Birta must improve on engaging and planning features
> and seasonal transitions.

[44], Ex. 16 at p. 1.[2]

Ford and Wisecup met to discuss the performance review. Ford testified that she told Wisecup, "I can't believe this. . . So you mean I don't do nothing right, not nothing [sic] in the store?" [44], Ex. 1 at p. 29. She further testified that Wisecup responded by laughing and telling her, "I'm going to let you stay here and let you read over it." *Id*. Ford stated that she believed Wisecup stepped out of the room for a minute and planned to return to further discuss the evaluation; however, she later learned that he had gotten in his car and left. Ford again utilized the Open Door Policy to make Searcy aware of this incident.

On March 16, 2019, Wisecup issued Ford another disciplinary action, which was labeled as a Disciplinary Action 3 – Red. Wisecup's description of Ford's conduct was as follows:

> On 3/11/19 and 3/12/19, Birta failed to ensure houseware/domestic
> bins were capped. Merchandise was found with no labels and/or no
> counts on the cases. Some of the merchandise also scanned showing
> picks and not capped into the bins. This was discussed with Birta
> on 3/11/19 and Birta failed to follow up on this issue on 3/11/19 or
> 3/12/19 while the department managers were still here and after 4
> pm that evening, the bins were still not corrected. Also on 3/12/19
> and 3/13/19, Birta failed to ensure outs were scanned in departments
> 5/6/72/87.

[39], Ex. 5 at p. 2.

On June 24, 2019, Ford went on FMLA leave. In mid-August 2019, while Ford was on leave, Wal-Mart initiated a company-wide reduction in force. Searcy and Wisecup both testified that they were unaware of the company's intent to initiate a reduction in force until they received an email from the "home office" describing the changes that must be implemented. The "home

---

[2] The performance review covered the time period of February 1, 2018, through January 31, 2019. The evaluation was electronically signed by Ford on March 1, 2019, and by Wisecup on March 2, 2019.

office" email, which Searcy and Wisecup received in August 2019, provided some general information concerning the reduction in force and then included a specific list of changes for the Louisville store. In pertinent part, the email explained:

> There will no longer be an overnight (ON) ASM position in your store, which means your overall ASM headcount will be reduced. **(NOTE: The headcount reduction will be based on current approved ON ASM structure. For example, if the store is currently approved for two ON ASMs, then headcount is reduced by two.)**

[39], Ex. 8 at p. 2 (emphasis in original).

The email also provided criteria that should be utilized in the determination as to which employee(s) should be impacted first by the reduction in force. It also included a specific chart listing and ranking the Louisville Assistant Store Managers based upon that criteria:

> Below you will find ASMs in your store in groups based on eval competencies, disciplinary actions and hire date. Associates at the top of the list should be impacted first to get to your new budget hours guidance.
>
> . . .
>
> When there is more than one associate in a group, the associate with the most recent hire date is impacted.
>
> 1:    2 *Development Needed* or lower with *Disciplinary Actions*
> 2:    2 *Development Needed* or lower, no *Disciplinary Actions*
> 3:    *Solid*, no more than 2 *Development Needed* or lower with *Disciplinary Actions*
> 4:    *Solid*, no more than 2 Develop [sic] Needed or lower, no *Disciplinary Actions*
> 5:    2 or more *Exceeds Expectations* with *Disciplinary Actions*
> 6:    2 or more *Exceeds Expectations* without *Disciplinary Actions*

| Name | Grow the Business | Inspire and Motivate | Operate with Discipline | Disciplinary Action | Group | Hire Date |
|------|------|------|------|------|------|------|
| Birta Ford | Development Needed | Development Needed | Development Needed | Red | 1 | 10/27/1993 |
| Kristy Shack | Meets Expectations | Development Needed | Development Needed | | 2 | 5/11/2017 |
| Tobi Beckham | Meets Expectations | Meets Expectations | Meets Expectations | | 4 | 11/16/2011 |
| Mattie Knowles | Meets Expectations | Meets Expectations | Meets Expectations | | 4 | 7/23/1994 |
| Eric Joiner | Exceeds Expectations | Exceeds Expectations | Meets Expectations | | 6 | 7/6/2000 |

[39], Ex. 8 at p. 2-3.[3]

Since Ford was on FMLA leave at the time, Wisecup sent Ford a letter advising her that her position would be eliminated as a result of the reduction in force and that she had until January 2020 to find a new position. Searcy and the Store Managers from across the market thereafter held a meeting and conducted a "talent balancing" exercise, during which decisions were made as to how Wal-Mart would reallocate its personnel following the reduction in force. In addition to Ford, three other Louisville Assistant Store Managers were transferred: Mattie Knowles (black female, age 58) transferred to the Philadelphia, Mississippi location; Kristy Shack (black female, age 35) transferred to the Starkville, Mississippi location; Eric Joiner (black male, age 48) transferred to the Columbus, Mississippi location. Two Assistant Store Managers were transferred into the Louisville store: Barbara Jolly (white female, age 47) and Jeremy England (white male, age 26). Ford ultimately moved into a pharmacy sales associate hourly position at Wal-Mart's Philadelphia, Mississippi location. While Ford's salary as an ASM as of January 2020 was "around $50,000.00" per year, her new position paid $17.75 per hour. [44], Ex. 2 at p. 3.

---

[3] The Court modified the first column of the employee chart so as to remove information irrelevant to this lawsuit and to otherwise avoid confusion.

Ford initiated this action on February 1, 2021. In her Amended Complaint [15], Ford alleges that Wal-Mart is liable for: (1) violation of the Family and Medical Leave Act ("FMLA"); (2) race discrimination in violation of Title VII; (3) race discrimination in violation of 42 U.S.C. § 1981; and (4) age discrimination in violation of the ADEA. She additionally avers that Wisecup is liable "for race discrimination under 42 U.S.C. § 1981, and tortious/malicious interference with employment." [15] at p. 6. The Defendants seek dismissal of all claims.[4]

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240 at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold*

---

[4] In her Memorandum [45], Ford withdrew her FMLA claim. Therefore, to the extent the Defendants' Motion [39] seeks dismissal of that claim, it is GRANTED. Ford's FMLA claim is dismissed *with prejudice*.

*v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). But "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citations omitted).

## Analysis and Discussion

Prior to analyzing Ford's claims, the Court will make one clarification. Ford asserts that she is a member of three protected classes: (1) race; (2) age; and (3) race plus age. This Court has previously declined to recognize sex plus age as a separate protected category. *See Birchfield v. City of West Point, Miss.*, 2021 WL 277810, at *3 n. 1 (N.D. Miss. Jan. 27, 2021); *Cash v. Walgreen Co.*, 2020 WL 1846535, at *4 n. 4 (N.D. Miss. Apr. 10, 2020). For the same reasons articulated in those cases, the Court rejects Ford's request to recognize race plus age as a separate class. The Court will address her race claims and her age claim separately. To the extent she asserts a race plus age claim, that claim is dismissed *with prejudice*.

### I.    Race Discrimination

As to race, Ford contends that Wal-Mart is liable pursuant to Title VII and Section 1981. She also asserts a Section 1981 claim against Wisecup. The Court will analyze these claims together, as "[t]he analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) (citing *Jones v. Robinson Prop. Grp. L.P.*, 427 F.3d 987, 992 (5th Cir. 2005)).[5]

---

[5] As noted above, Ford asserts Title VII and Section 1981 claims against Wal-Mart but only asserts a Section 1981 claim against Wisecup. Under Title VII, relief is only available against an "employer" as that term is defined in 42 U.S.C. § 2000e(b). *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 340 n. 8 (5th Cir. 2003). While the Fifth Circuit has not definitively decided the issue, "[d]istrict courts within the Fifth Circuit generally have interpreted *Foley* to recognize individual liability under § 1981 for supervisors who exercise control over employment decisions and were personally involved in the complained-of conduct, but have refused to allow a claim under Section 1981 against a mere co-worker." *Thomas v. Link Staffing*, 2019 WL 486875, at *4 (S.D. Tex. Jan. 8, 2019) (citations omitted). The Fifth Circuit has recently noted this uncertainty. *See Escamilla v. Elliott*, 2022 WL 2387354, at *2 n. 2 (5th Cir. July 1, 2022). The Court will therefore address them no further but simply points out the distinction for the sake of clarity.

To succeed on a claim for race discrimination under Title VII or Section 1981, a plaintiff may establish a *prima facie* case either through direct or circumstantial evidence. *Gilleylen v. City of Tupelo, Miss.*, 2017 WL 4050322, at *2 (N.D. Miss. Sept. 13, 2017). In the absence of direct evidence, "the Court uses the *McDonnell Douglas* burden shifting framework to assess the sufficiency of the evidence." *Gossett v. Allegiance Specialty Hosp. of Greenville, LLC*, 2021 WL 4504694, at *3 (N.D. Miss. Oct. 1, 2021) (citing *Harville v. City of Houston*, 945 F.3d 870, 874-75 & n. 10 (5th Cir. 2019)).

Under the *McDonnell Douglas* framework, the plaintiff bears "the initial burden to establish a *prima facie* case of discrimination[.]" *Harville*, 945 F.3d at 875. "The *prima facie* case, once established, creates a presumption of discrimination and the burden then shifts to the [defendant] to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id*. (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)). "If the employer does so, the plaintiff 'must . . . produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination.'" *Gossett*, 2021 WL 4504694 at *4 (quoting *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016)).

A.    *Prima Facie Case*

The Fifth Circuit has articulated the plaintiff's *prima facie* burden as follows:

> To establish a *prima facie* case of racial discrimination in employment, an employee must demonstrate that she (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. With respect to the "similarly situated employees" requirement, a plaintiff must show that [she] was treated less favorably than others under nearly identical circumstances.

*Morris v. Town of Independence*, 827 F.3d 396, 401-02 (5th Cir. 2016) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 319-20 (5th Cir. 2014)) (internal quotation marks and additional citations omitted).

The Defendants do not dispute that Ford can satisfy the first three elements of her *prima facie* case—particularly, that she is a member of a protected class, was qualified for her position as an Assistant Store Manager, and suffered an adverse employment action. However, the Defendants take issue with the fourth element and specifically contend Ford cannot show she was treated less favorably than other similarly situated employees. The Defendants argue:

> Ms. Ford cannot produce evidence that any Caucasian ASM in the Louisville store had performance issues such that a disciplinary action was warranted or that any Caucasian ASM in the Louisville store deserved three "Development Needed" assessments in their last performance review. While it is true that Caucasian ASMs kept their positions after the restructure, the Caucasian ASMs were not similarly-situated to Ms. Ford. . . The Caucasian ASMs in the Louisville store were not similarly-situated to Ms. Ford based on their last performance evaluation and their disciplinary action history. No Caucasian ASM in Louisville had "Development Needed" in three categories on their last performance evaluation and none had any disciplinary actions.

[40] at p. 16-17.

In response, Ford contends that she was "in essence, replaced by a younger white employee." [45] at p. 21. She emphasizes that as part of the reduction in force, four black managers were moved out of the Louisville store and two white managers replaced them.[6]

---

[6] Although the Defendants argue only that Ford cannot show another similarly situated employee was treated more favorably, a plaintiff may satisfy the *prima facie* fourth element by showing that other similarly situated employees were treated more favorable *or* by showing that she was replaced by someone outside of her protected class. *See, e.g.*, *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004) (citing *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001)) (explaining that a plaintiff satisfies the fourth prima facie element by showing that he/she "was replaced by someone outside the protected class, *or*, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably.") (emphasis added).

In addition, while the Defendants argue that Ford cannot show that other similarly situated employees were treated more favorably because she cannot point to any other Assistant Store Managers with a similar disciplinary history or performance evaluation, the Court notes that the imposed disciplinary actions and the 2019 performance evaluation are the precise actions which Ford claims were imposed against her in a discriminatory fashion. To prohibit Ford from proceeding on that ground would, in this Court's view, run afoul of the Supreme Court's directive that the *prima facie* case should be treated as a "flexible evidentiary standard." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

The Court also notes that the Fifth Circuit has described a plaintiff's *prima facie* burden as "very minimal." *See Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 825 (5th Cir. 2022). The Court finds that Ford has come forward with sufficient evidence to satisfy such a low threshold.

B.       *Legitimate, Nondiscriminatory Reason*

The burden then shifts to the Defendants, "who maintain the 'burden of articulating some legitimate, nondiscriminatory reason for the adverse employment action.'" *Russell v. City of Tupelo, Miss.*, 544 F. Supp. 3d 741, 757 (N.D. Miss. June 16, 2021) (quoting *Snyder v. L-3 Comms. Vertex Aerospace, LLC*, 2020 WL 869977, at *6 (N.D. Miss. Feb. 21, 2020)) (additional citation omitted). At this stage, the Defendants' burden is "a mere burden of production rather than a burden of persuasion." *Id*. (citations omitted). This stage involves no credibility assessment. *See Cervantez v. KMGP Servs. Co. Inc.*, 349 F. App'x 4, 8-9 (5th Cir. 2009) (additional citations omitted).

Wal-Mart asserts that Ford's position was eliminated as part of a corporate reduction in force. This constitutes a legitimate, nondiscriminatory reason for the employment decision, and the Court therefore finds that Wal-Mart has carried its burden.

C.       *Pretext*

The burden then shifts back to Ford to show that "the proffered legitimate nondiscriminatory reason is a pretext for discrimination.'" *Gossett*, 2021 WL 4504694 at *4 (quoting *Outley*, 840 F.3d at 216). The Defendants contend that, for Ford to prevail, she "would have to produce some evidence that Mr. Wisecup knew months in advance that there was going to be a corporate announcement in mid-August 2019, that the restructure was going to eliminate an ASM position, and that he knew in advance the criteria that were going to be used to rank the ASMs in the Louisville store." [40] at p. 18. On the other hand, although admitting that she had three "Development Needed" scores on her most recent performance review and that her disciplinary action level was "Red" at the time the reduction in force was instituted, Ford contends that Wisecup was solely responsible for the scores and the disciplinary actions and that, in imposing the same, he acted with discriminatory animus. In other words, she concedes that she was the logical candidate based upon the criteria created by the "home office" but contends that she was the logical candidate *only because of Wisecup's animus toward her*. She argues Wisecup's alleged animus is sufficient to impute liability to Wal-Mart.

To support her argument that Wisecup's purported animus *could* be imputed to Wal-Mart, Ford points to the Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S. Ct. 1186, 179 L. Ed. 2d 144 (2011). She specifically quotes the following language from that case: "if a supervisor performs an act motivated by . . . animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . ." [45] at p. 27 (quoting *Staub*, 562 U.S. at 422, 131 S. Ct. 1186) (emphasis in original). Citing *Staub*, the Fifth Circuit has held that "[u]nder the cat's paw theory, a subordinate employee's discriminatory remarks regarding a co-worker can be attributed

to the workplace superior, ultimately the one in charge of making employment decisions, when it is shown that the subordinate influenced the superior's decision or thought process." *Haire v. Bd. of Supervisors of La. State Univ. Agric. and Mech. Coll.*, 719 F.3d 356, 366 n. 11 (5th Cir .2013) (citing *Staub*, 562 U.S. at 422, 131 S. Ct. 1186).

The issue before the Court here is slightly different, as there is no evidence that Wisecup (the alleged bad actor) exerted influence over the "home office" in decision to implement a reduction in force or the creation of the criteria to be utilized in carrying it out. In fact, there is no competent summary judgment evidence in the record that, at the time of the allegedly discriminatory disciplinary actions and poor performance review, Wisecup was even aware of the upcoming reduction in force.[7] The specific issue therefore becomes whether Wisecup's allegedly discriminatory conduct can be imputed to Wal-Mart, even though at the time of the allegedly discriminatory conduct Wisecup was unaware of the upcoming reduction in force.

Notably, in their briefing, the parties spend relatively little time addressing this issue. Ford references only the above-quoted language from *Staub*, which is a case undoubtedly factually distinguishable from the case at bar. The Defendants likewise cite no authority directly on point. The Court has located non-binding precedent addressing this issue.[8]

The Eighth Circuit addressed a factually analogous situation in *Cherry v. Siemens Healthcare Diagnostics, Inc.*, 829 F.3d 974 (8th Cir. 2016). In that case, the plaintiff (Farrell

---

[7] In her deposition, Ford testified that she believed Wisecup knew of the upcoming reduction in force prior to receiving the "home office" email. However, she admitted that she had nothing other than her own subjective belief to support that theory, testifying: "I just feel like that he [knew] it. . . That's what I believe." [44], Ex. 1 at p. 42. Ford's subjective belief, which admittedly was supported by no other evidence, is insufficient. *See, e.g.*, *Marks v. St. Landry Parish Sch. Bd.*, 75 F. App'x 235 (5th Cir. 2003) (collecting cases and noting that an employee's subjective belief alone cannot substantiate a claim of discrimination).
[8] In a pre-*Staub* case, the Fifth Circuit was presented with a similar argument; however, the court disposed of that case on the basis that the plaintiff could not establish actual discriminatory animus on the part of the employee's supervisor. *See Roberson v. Alltel Information Servs.*, 373 F.3d 647, 653-54 (5th Cir. 2004). Thus, the Fifth Circuit did not address the particular issue at hand.

Cherry), a black employee of Siemens, alleged that his direct supervisor (Blaine Raymer) "made various derogatory comments to or about Cherry, acted disrespectfully toward Cherry, and told stories and jokes that created a racially hostile environment for Cherry." *Id*. at 975. Cherry asserted that Raymer treated one of Cherry's white co-workers (Dave Eide) more favorably because of his race. *Id*. When Siemens later initiated a reduction in force, the criteria utilized to select the employees who would be impacted was the "performance reviews done by the employees' immediate supervisors—Raymer, in Cherry's case—from the last three years." *Id*. at 976. During that time period, Cherry received poor performance reviews from Raymer (which Cherry contended were racially motivated). *Id*. Those poor performance reviews ultimately led to Cherry being impacted by the reduction in force. *Id*. However, it was undisputed that Raymer was unaware of the upcoming reduction in force at the time he gave Cherry the negative reviews. *Id*.

Cherry filed suit against Siemens, alleging that his termination was racially motivated in violation of Title VII. *Id*. The district court granted summary judgment in Siemens' favor. *Id*. The Eighth Circuit affirmed and, in pertinent part, held:

> The difficulty with applying the cat's paw theory in this case—setting aside the fact that Cherry did not explicitly raise it before the district court—is *that Raymer did not actually know of the planned reduction in force at the time he took the allegedly discriminatory actions against Cherry*. Raymer's negative performance reviews, in combination with his and Eide's inappropriate comments, may very well have been discriminatory in nature. But it would simply not be possible for Raymer to "use [Raymer's supervisor] as a dupe in a deliberate scheme to trigger a discriminatory employment action" when Raymer did not know in advance about the impending reduction in force. *Had Raymer known and then taken the actions he did with the intention of ensuring that Cherry, rather than Eide, was laid off, perhaps the cat's paw analysis would be applicable*. But that is not what happened here.

*Id*. at 977 (emphasis added).

14

As this excerpt makes clear, the Eighth Circuit declined to extend the cat's paw theory to circumstances almost identical to those before this Court, relying heavily on the supervisor's lack of knowledge of the upcoming reduction in force when imposing the allegedly discriminatory performance reviews.

On the other hand, the District Court of Oregon has recently addressed this issue and reached a different result. *See Tsur v. Intel Corp.*, 2021 WL 4721057 (D. Or. Oct. 8, 2021). In *Tsur*, the plaintiff, a longtime employee of Intel (Ron Tsur), was subjected to demeaning and discriminatory comments from his supervisor (Bruce Jones). *Id*. at *6. The comments were based, at least in part, on Tsur's Israeli national origin and age. *Id*. Jones also issued Tsur "a series of declining performance reviews." *Id*. Following the poor performance reviews, a representative from Intel's HR Department advised Tsur that he could either voluntarily separate from his employment with Intel or participate in a corrective action plan. *Id*. To keep his job, Tsur agreed to the corrective action plan. *Id*. Intel thereafter instituted a company-wide layoff, pursuant to which 1,155 employees lost their job. *Id*. at *7. Tsur was one of the employees selected for termination. *Id*. Intel advised Tsur that he had been selected for termination, at least in part, because of a poor performance review within the previous three years. *Id*.

Tsur filed suit asserting numerous claims against Intel, one of which was an ADEA retaliation claim. *Id*. Tsur alleged that Intel should be held liable for Jones' animus because Intel terminated him "in reliance on Jones' performance reviews . . . and that in doing so Intel knowingly reaffirmed and continued Mr. Jones' unlawful discrimination and retaliation[.]" *Id*. at *12. Intel filed a motion to dismiss, arguing "that cat's paw does not apply because Plaintiffs fails to allege facts showing that Jones's retaliatory animus caused Intel's 2015 reduction in force directive." *Id*. at *13. The District Court of Oregon rejected that argument, holding that "[t]he question is not . .

. whether retaliatory animus caused the decision to implement a reduction in force, *but whether retaliatory animus caused the decision to select Tsur for the layoff*." *Id*. at *13 (emphasis added). The district court continued:

> As the Supreme Court has explained, the cat's paw theory imputes animus even if the animus is only one among several proximate causes for the adverse employment action: 'The decisionmaker's exercise of judgment is also a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes.' . . . 'Proximate cause requires only some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect.' *Staub*, 562 U.S. at 1192 (simplified). An employer may take the adverse action for reasons other than the supervisor's biased report, but that is the employer's burden to show. *Id*. at 1193. *Further, a 'supervisor's biased report may remain a causal factor if the independent action takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified*. . . Even if other factors may also have caused Tsur's eligibility for the layoff, Tsur has sufficiently alleged that Jones's retaliatory animus was at least one proximate cause.

*Id*. (emphasis added).

The Court recognizes this split of authority and, candidly, sees persuasive arguments on both sides. However, rather than summarily deciding the present case on that ground, the Court will set aside that issue for now and first look to whether Ford has come forward with sufficient evidence to create a genuine issue of material fact as to pretext.

In doing so, the Court turns to the final step of the *McDonnell Douglas* analysis. The Fifth Circuit has recently explained the applicable standard as follows:

> . . . [T]he plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motives alternative).

*Vasquez-Duran v. Driscoll Children's Hosp.*, 2021 WL 3775350, at *4 (5th Cir. Aug. 25, 2021) (quoting *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

In analyzing pretext, the Court finds particularly pertinent and noteworthy the Fifth Circuit's recent decision in *Owens*, 33 F.4th 814.[9] There, the plaintiff, an Asian female (Owens), alleged—among other claims—that her employer (Circassia) terminated her in violation of Title VII. *Id.* at 823. Owens, who held the position of Regional Sales Manager for Circassia, began experiencing issues well before her ultimate termination on June 7, 2018. *Id.* The Fifth Circuit specifically noted three performance reviews. *Id.* Owens' 2016 end-of-year review identified multiple flaws with her performance; however, the next two reviews indicated no improvement. *Id.* On April 11, 2018, Owens' direct supervisor (Casey) met with her and advised her that she was being placed on a performance improvement plan ("PIP"). *Id.* The PIP summarized the issues with Owens' performance, described the areas of her performance that needed to be improved, and warned that failure to improve could result in termination. *Id.* Owens' performance did not improve, and she was ultimately terminated three days before the PIP expired. *Id.*

As noted above, Owens claimed (among other things) that her race played a role in the termination decision. *Id.* The district court granted summary judgment in Circassia's favor, and Owens appealed. *Id.* On appeal, the Fifth Circuit found that Owens could satisfy her *prima facie* burden, as she was a member of a protected group, was qualified for her position, suffered an adverse employment action, and was replaced by a white male. *Id.* Likewise, Circassia satisfied its burden of production by claiming that the termination was due to Owens' poor performance. *Id.* The bulk of the Fifth Circuit's analysis addressed the pretext stage. *Id.*

---

[9] *Owens* was decided after the parties filed their respective briefs in this case and therefore is not addressed in their filings.

One of Owens' pretext arguments was that "Circassia's stated reasons for firing her were inconsistent with reality and, given Circassia's own behavior, illogical." *Id*. at 830. In particular, she argued that the poor performance reviews she received were false. *Id*. The Fifth Circuit noted that "mere disputes over an employer's assessment of an employee's performance do not create issues of fact. But in policing this line, courts should be cautious not to dismiss *any* dispute as a *mere* dispute." *Id*. at 831 (citing *Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020)) (internal citation omitted, emphasis in original). The Fifth Circuit then noted that Owens' submitted declaration presented sufficient objective evidence such that "a reasonable trier of fact could find that Circassia's proffered justification for terminating Owens is false." *Id*. at 833. However, the court continued: "But that alone is not enough. The evidence must permit a reasonable inference that Circassia's false reason was pretext for the true, discriminatory, reason." *Id*. (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)) (additional citation omitted).

Therefore, the Fifth Circuit continued its analysis and considered whether she had come forward with evidence to support her theory that Circassia's reason was not only false, but also discriminatory. *Id*. Ultimately, the Fifth Circuit held that Owens had provided only "scant evidence of discriminatory treatment" and concluded that "although Owens likely presents enough evidence of illogic to permit a rational factfinder to think Circassia's proffered reason might be false, Owens *does not present the type of evidence necessary to permit an inference of discrimination*." *Id*. (emphasis added). The court also rejected Owens' other pretext arguments and consequently affirmed the district court's decision. *Id*.

With that overarching standard in mind, the Court turns to Ford's specific arguments in the case *sub judice*. She provides an extensive list of reasons that she believes support her pretext

argument. Many of the reasons can easily be disregarded at the outset for purposes of her race discrimination claims. For instance, some of the reasons are solely related to age, which clearly is not protected by Title VII. One of the other listed reasons is based upon Ford's belief that Wisecup "did not like [her] and was trying to get rid of her because he would never give her a weekend off." [45] at p. 24. This Court has repeatedly held that "a complainant's own subjective belief of discrimination, no matter how sincere, cannot alone serve as a basis for judicial relief." *Stringer v. North Bolivar Consolidated Sch. Dist.*, 2017 WL 1032019, at *3 (N.D. Miss. Mar. 15, 2017) (quoting *Moore v. McCullough*, 351 F. Supp. 2d 536, 541 (N.D. Miss. 2005)) (additional citation omitted). Additionally, she makes the conclusory assertion that "Ford was told her job was eliminated because they were eliminating overnight stocking. *But this was most likely a ruse to get rid of some managers because they resumed it around a year later*." [45] at p. 25 (emphasis added). Ford provides no evidence to support this conclusory, speculative allegation that Wal-Mart's conduct "was likely a ruse"—falling below the threshold necessary to preclude summary judgment. *See, e.g.*, *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (citation omitted) ("This Court has cautioned that conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment."). Ford also makes reference to an incident when Wisecup took home from the store an iPad that she needed to use during her shift; however, she admitted that she did not receive any type of discipline for this incident and provides no explanation as to how the incident was in any way related to her race.

Setting aside those proffered reasons, the Court turns to Ford's additional pretext arguments. First, the Court notes Ford's argument that the disciplinary actions and the poor performance review which Wisecup imposed against her were not warranted. As to the first disciplinary action Wisecup imposed against her, Ford testified:

> Q. All right. So those are – those are the only notes that you took during your time that you had interaction with Mr. Wisecup, right?
>
> A. Yes, sir.
>
> Q. All right. Let's look at Page 154. You write a note that's dated February 28, 2019, about Mel coming to have an open door about your concerns and to discuss the coaching you received on February 22, 2019.
>
> A. Uh-huh (Indicating yes).
>
> Q. Now, did Mel actually come to the store?
>
> A. He came. Yes, sir.
>
> . . .
>
> Q. You told Mel about the coaching and then you state that "he told a lie and put my job in jeopardy." Who do you say told a lie?
>
> A. Matthew.
>
> Q. What was the lie that you allege Matthew told?
>
> A. About I didn't know where my associates were and that I wasn't managing the store.

[44], Ex. 1 at p. 15.

Ford further testified that, during their meeting, Searcy informed her that he was "not going to overturn [his] store manager's decision." *Id*. Unsatisfied with the result of that meeting, Ford emailed Searcy and asked that he come back to the store to discuss the matter further.

Similarly, Ford testified that she disagreed with the final disciplinary action she received from Wisecup. That disciplinary action related to the binning process at the store and, more particularly, Ford's handling of a subordinate employee, Vernita Hughes', failure to comply with Wal-Mart's protocol:

Q. All right. So Ms. Hughes would like to be a little argumentative, I guess.

A. Yes, sir. She would. She would be. So it was about the bins, about her scanning the bins. Now, she would always want to do it her way, but she would scan the bins regardless. It might be late in the evening, but that wasn't protocol. You should do it -- you should have did it, you know, that morning when you come in. So Matthew [Wisecup] had got with me about Vernita, about her work and stuff. She was a good worker, but she -- just about them bins. And he told me about it. She did do a couple of times. So – and I went to her. I said, "Vernita, if you do it again I'm going to have to bring you in. You got to do your bins. I don't care if you don't like it, you got to follow the procedures on it. You got to do it."

Q. This was day shift, right?

A. This was day shift. She didn't. That next – I say maybe a couple days, she didn't. So when she didn't, when I got there and find out she hadn't, I called in and I coached her for it, just like I told her. And I said, "I'm going to have to coach you." Matt [Wisecup] had got with me on a Tuesday. It was a Tuesday. And I coached her on a Wednesday. He wasn't at work. This was his day off. I never did tell him that I coached her. I didn't tell him because I didn't think it was, you know, just important. And so the next thing I know I was called in the office again. And I think this was on a Saturday. . . . And I say, "What is this about?" And he say, "Well, it's because Vernita did not scan her bins." I said, "No, she didn't." And I told him. He proceeds to – I said, "Well, I coached her." He said, "When did you coach her?" I said, "I coached her Wednesday." He said, "How come I don't know it?" I said, "Because you was off. You was off Wednesday." And he said, "Now, you see there. She's going to run to me, she going to come running to me with this." And I said, "Well, I did what I thought I should do. I told her I was going to coach her if she didn't follow the thing, and I coached her." And he said he wasn't going to take it off [Ford's record], he was going to leave it on there. And that's how that come out about the second coaching.

[44], Ex. 1 at p. 24-25.

Finally, Ford testified as follows regarding her meeting with Wisecup to discuss the poor performance review he had given her:

> **Q.** Okay. Did you and Mr. Wisecup sit down and talk about the 2019 performance evaluation?
>
> **A.** Yes, sir. We was sitting down going over it. And as he read it off to me and telling me what my score and – it got to – well, everything was a development need. Development need. And I say, "I can't believe this." And I said, "So you mean I don't do nothing right, not nothing in the store?" And he laughed and he got up, for which I thought – he said, "I'm going to let you stay here and let you read over it." I'm thinking he went to just step out for a few minutes. I'm sitting there waiting for him to come back. He never did come back. And it was time – I remember Mattie walked in the office and she asked me what I was doing, and I said, "Waiting on Matt." She said, "Well, I saw Matt get in the car and leave." I said, "No, he couldn't leave because he's going over my eval." And that's when I found out everybody had – he had went over their eval and I was the last one. And I did not even finish it. I didn't sign it, didn't finish going over it. So I e-mailed Mel [Searcy] and them about it. I did not even finish – we didn't even finish going over this.

[44], Ex. 1 at p. 29.

As to these disciplinary actions and the poor performance review, the Court is cognizant that "[m]ere disputes over an employer's assessment of an employee's performance do not create issues of fact." *Owens*, 33 F.4th at 831 (citing *Salazar*, 982 F.3d at 389). However, "courts should be cautious to not dismiss *any* dispute as a *mere* dispute." *Id*. (emphasis in original). In balancing this tightrope, the Court looks to Ford's specific explanations. As to the first disciplinary action imposed by Wisecup, the Court notes that Ford simply appears to disagree with Wisecup's assessment, stating that Wisecup's "lie" was that "[she] didn't know where [her] associates were and that [she] wasn't managing the store." [44], Ex. 1 at p. 15. Furthermore, the Court notes that, despite reporting this matter to Searcy, Ford herself admitted that she did not make any reference

22

to race during that conversation. As to the final disciplinary action, Ford does make *some* argument in opposition to it, but the Court similarly views it as a *mere* dispute. She makes a generalized assertion as to why she disagreed with it (stating that she eventually addressed the matter with Hughes), but she does nothing more. Finally, regarding the performance review, Ford's argument relates to Wisecup's handling of the matter—in particular, allegedly laughing at her and leaving the room. Although that conduct, if true, is certainly distasteful, those allegations do not specifically rebut the accuracy of the performance review. Consequently, having closely reviewed Ford's disputes over Wisecup's assessment of her performance, the Court finds Ford's contentions to be nothing more than "mere disputes" insufficient to create an issue of fact.[10]

Ford also points to the testimony of other individuals regarding Wisecup's purported racial bias. Tina Hannah, a black female who previously worked for Wal-Mart and at times worked under Ford's supervision, testified as follows:

> **Q.**    Do you think your race or age had anything to do with the way you were being treated by Mr. Wisecup?
>
> **A.**    My age? No. Race? Maybe sometime.
>
> **Q.**    Why did you feel that sometimes?
>
> **A.**    Okay. For instance, if a Caucasian supervisor is doing something wrong, it's no problem. But if a black or an African American is doing something, that's a whole different ballgame.

[44], Ex. 4 at p. 3.

Hannah also testified about the way in which the racial composition of Assistant Store Managers changed at Louisville following Wisecup's arrival:

---

[10] Again, cognizant of the Fifth Circuit's directive in *Owens*, the Court does not summarily reject Ford's opposition to the disciplinary actions or the performance review but, instead, relies on the above analysis to support its conclusion that Ford's particular disputes here do in fact constitute "mere disputes."

Q.    After [Mr.] Wisecup came, did the racial makeup of the assistant managers change drastically?

A.    It did.

Q.    And my understanding is sometime in 2019 Ms. Birta and three other black assistant managers were sent to other stores?

A.    They were.

Q.    And two white managers came in?

A.    Uh-huh (Indicating yes).

*Id*. at p. 4.

Ford additionally points to the deposition testimony of Gloria Moore, another former Wal-Mart employee who worked under Ford's supervision for some period of time. Moore testified as follows regarding Wisecup:

Q.    Do you think your age or your race had anything to do with the way you were being treated by Mr. Wisecup?

A.    Yes. Some of the time, yes.

Q.    Do you think it was your age, your race or both?

A.    Both.

. . .

Q.    Did he ever make any comments that you thought were racist or maybe racially insensitive against black people that you heard?

A.    That I heard? No. Only thing, he just made me feel like -- he just -- I don't know. He just want me to work. When it's time for me to get off -- and I couldn't never get off on time. If I supposed to get off at 7:00, I be there until 9:00 or 10:00 in the morning to try to satisfy him. You know, whatever he want you to do if you don't do it he always won't have anything -- he already don't speak. And he just don't have

24

anything else to say. I want this done. I want this done, you know.

[44], Ex. 6 at p. 5.

Moore also testified as follows concerning how the night shift was treated differently than other shifts:

> **Q.** . . . Let me show you some pictures that were introduced yesterday as Exhibit Number 2. Let me pass those over to you. Let me just tell you, we introduced – these were introduced yesterday, and Ms. Ford testified that this was a mess that you guys would come into a lot of times when you started the shift.
>
> **A.** It was.
>
> **Q.** Does that look like the mess that you would come into when you started your shift?
>
> **A.** Yes, sir.
>
> **Q.** Are you aware of the people who left the place like that for you to come in, whether they got disciplined or not?
>
> **A.** Who was the people that left it here?
>
> **Q.** The people who left that mess for you?
>
> **A.** I don't know the people that – it has been a while. I can't even think of their name who left this here. But this is what we did come into.
>
> **Q.** Often or rarely?
>
> **A.** We came in it very often.
>
> **Q.** Very often you would come in and it would be a mess?
>
> **A.** Uh-huh (Indicating yes).
>
> **Q.** And when your shift was over were you held accountable for the shape that the store was in by Mr. Wiseceup?

> **A.** Yes. When we come into this, we have to clean it up and have it done. So, like I was saying when I get off in the morning time, it would be about 9:00 or 10:00. And he'll come back there and tell me, you can leave now. Even I could be on the floor doing something else.
>
> **Q.** Mr. Wisecup wouldn't let you leave if the store looked like that, would he?
>
> **A.** No. If we left it like this, we couldn't leave. But we come into this. He don't never make them stay there to do it, but we always have to clean up behind somebody else.
>
> **Q.** Were you working overnight at that time, stocking overnight?
>
> **A.** Yes, sir. I was, you know, in support. Yes, sir.

[44], Ex. 6 at p. 5-6.

In addition, Ford herself testified that Wisecup made hostile comments toward her:

> **Q.** Like what?
>
> **A.** The little comments.
>
> **Q.** Give me an example.
>
> **A.** Okay. Example of a comment. It was like *you are lost under the radar. What you got away with you won't get away with no more.*

[44], Ex. 1 at p. 17 (emphasis added).[11]

The Court first turns to the testimony of Tina Hannah. Hannah testified that, under

Wisecup's leadership, it was a "whole different ballgame" if a black manager was doing something

---

[11] In his deposition, Wisecup denied making this particular comment or any other comment related to race or age. However, at the summary judgment stage, the Court's duty is to view the evidence in the light most favorable to the non-moving party—in this case, Ford. *See*, *e.g.*, *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 358 (5th Cir. 2017) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)) ("When considering summary judgment evidence, [the reviewing court] must view all facts and inferences in the light most favorable to the nonmoving party.").

wrong, as opposed to a white manager. However, when asked to provide an example, Hannah testified as follows:

> Q. Can you give me any examples of that?
>
> A. For instance, like the back room. If we come in at 4:00 in the morning, if the supervisor worked that night, overnight, whatever, *she was African American but, still*, everybody there got a job to do. When you come in at night, everybody got a job to do. When you come in in the morning it shouldn't be freight still left from the night before, the day before still there on the floor. And he expect for us to move it. You can't move freight like that if the back room is full and it's overflowing. You can't move freight like that.

[44], Ex. 4 at p. 3 (emphasis added).

As this excerpt makes clear, the example Hannah provided involved another black manager, thereby undercutting the impact of her contention that it was race-based. This leaves only her previous generalized statement that it was a "whole different ballgame," but without any specific evidence to support that statement, the Court views it as insufficient to preclude summary judgment. *See, e.g.*, *Carr v. Air Line Pilots Association, Int'l*, 866 F.3d 597, 601 (5th Cir. 2017) (quoting *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)) ("[T]he nonmovant must 'identify *specific* evidence in the record and . . . articulate the *precise* manner in which that evidence supports his or her claim.'") (emphasis added). By that same token, Gloria Moore's testimony likewise falls below the requisite threshold. She similarly provides a general allegation that her race and age played a role in the way Wisecup treated her when she arrived for her shift. However, the explanations she gave do not, in this Court's view, provide any specific example of black employees being treated less favorably than white employees. She provided a general grievance with the manner in which she was treated; however, she did not provide any explanation as to how that alleged treatment related to her race or how white employees were treated

differently. Additionally, as to Wisecup's purported statement that "[w]hat you got away with you won't get away with no more," Ford has not provided any explanation as to how that statement pertains to her race.

Ford also emphasizes, as was referenced above in the *prima facie* portion of the analysis, that following the institution of the reduction in force, four Assistant Store Managers (including Ford) were displaced from the Louisville store. All four of the displaced Assistant Store Managers were black. The new Assistant Store Managers, both of whom were white, were moved into the Louisville store. The Defendants contend that the change in the racial composition of Assistant Store Managers was simply happenstance and the decisions were made during the "talent balancing" meeting without regard to race. In large part, the Defendants aver that the placement decisions had to do with the size of the Louisville store—particularly, that it is a smaller store which is oftentimes utilized as a location for Assistant Store Managers to gain experience before being moved to larger stores. While cognizant that it must view all evidence in the light most favorable to Ford, the Court notes that her only real argument in opposition to the Defendants' explanation is that the reduction in force must have been an orchestrated ruse to eliminate certain Assistant Store Managers. However, her argument to support that contention is: "this was most likely a ruse to get rid of some ASMs the stores wanted to get rid of because WalMart in Louisville went back to overnight stocking a year later in October 2020." [45] at p. 10. While the Defendants do not dispute that the Louisville store went back to overnight stocking about a year after the reduction in force, Ford provides no evidence whatsoever to support her speculative assertion that the entire reduction in force was a ruse, and the Court finds it insufficient.

The Court also notes that Ford attaches to her Response [44] an unsigned and undated letter, which begins with the following statement:

28

> On behalf of the Associates of Walmart Store #183 in Louisville, MS, we have a compiled list of unfair and unjust treatment, discrimination, and harassment, lack of respect, poor communication, intimidation and retaliation, unjust firing of employees, unprofessionalism, ethics and integrity, poor leadership, and misconduct. We believe that these actions of our store manager violate Walmart ethics and is a form [of] bullying in the workplace.

[44], Ex. 27 at p. 1.

The letter then lists several incidents of alleged discrimination and unfair treatment which occurred under Wisecup's leadership. In her deposition, Ford was questioned about the origin of the letter and how she got in possession of it:

> **Q.** I think we were talking about this document. You referenced this document before we took our last break. Tell me how you obtained this document?
>
> **A.** They gave it to my daughter at work. She was working at Pizza Hut. And she brought it home and said, "Mama," say, "they told me to give you this document." I'm thinking it come from Thomas or Tina. I don't know which one. Well, they brought it to her. She said I think it's Thomas that brought her this to work. And she brought it to me. And that's how I obtained this.
>
> . . .
>
> **Q.** You're not sure who brought it to you?
>
> **A.** I don't remember which one she said brought it to her.
>
> . . .
>
> **Q.** Okay. All right. Now, it is not signed by anybody. Did you - - - after receiving this, did you - - - were you working in Philadelphia? When did you receive it?
>
> **A.** I was in Philadelphia when I received it. Because, like I said, they gave it to her , gave it to my daughter Katrina.
>
> . . .
>
> **Q.** Do you know who typed this document?

29

**A.**     No, sir.

[48], Ex. 1 at p. 8-11.

Ford was then specifically questioned about the allegations contained in the letter, expressing little to no personal knowledge of each of the allegations contained therein. The Court rejects Ford's argument that this unsigned, undated letter can be utilized to thwart summary judgment. As noted above, Ford herself admits she does not know who prepared the document and she has minimal knowledge of the allegations contained therein. Although, at the summary judgment stage, the evidence cited need not in its current form be admissible in evidence, materials must be "capable of being 'presented in a form that would be admissible in evidence.'" *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(c)(2)). Here, Ford has no personal knowledge of who prepared the letter, the date it was prepared, or whether it is authentic—and she has only minimal knowledge regarding the allegations contained therein. Further, she makes no argument as to how she intends to clear the evidentiary hurdles for such a document to be admissible. To preclude summary judgment on this ground would, in the Court's view, inappropriately lower the requisite threshold that a plaintiff must surpass.[12]

Furthermore, although certainly not dispositive, the Court also notes that, despite now claiming that her termination was based on race, Ford admitted in her deposition that she never

---

[12] The Court additionally notes Ford's contention that Wisecup told her she had could not continue working at the Louisville store following the reduction in force but that she had to move to a different store. Ford, citing the deposition of Searcy and HR Manager Michael Hooker, contends: "[h]owever, it is not an ironclad rule and could have been approved by someone above market level." [45] at p. 25. The Court finds this argument unpersuasive. While Ford contends that Wisecup's statement establishes purported animus toward her (because he did not want her at the Louisville store anymore), she does not contend that she in fact applied for a position at the Louisville store nor does she make any contention that she would not otherwise have been impacted by the reduction in force if she could have been placed in a different position within the same store. Simply put, the Court finds this argument to be a non-starter.

mentioned race in her conversations with Wisecup or Searcy, and she did not pursue Wal-Mart's internal protocols for reporting purported race discrimination. Again, the Court does not view Ford's failure to do so as outcome-determinative, but the Court does feel compelled to note that, despite being in communication with Searcy on multiple occasions about Wisecup's management, race was never raised.

Additionally, the Court notes that there was a relatively significant lapse in time between the allegedly discriminatory disciplinary actions and the poor performance review and the reduction in force. The allegedly wrongful conduct occurred in February and March of 2019, yet the reduction in force occurred in August 2019. Ford makes no allegation that Wisecup engaged in discriminatory conduct against her between March 2019 and the implementation of the reduction in force in August 2019.

In sum, having carefully considered all of this evidence, the Court finds that Ford has come forward with only "scant evidence of discriminatory treatment." *Owens*. 33 F.4th at 833. This is, as noted above, insufficient to preclude summary judgment. *See id*. Although the Court understands Ford's dissatisfaction with being impacted by a reduction in force, the Fifth Circuit has on multiple occasions made clear that "employment laws do not transform federal courts into human resources managers[.]" *Id*. at 826 (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)). Instead, the appropriate inquiry is whether, "viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Id*. (quoting *Crawford v. Formosa Plastics. Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)). For the reasons set forth above, the Court finds that a reasonable factfinder could not do so. Summary

judgment is therefore appropriate and is hereby GRANTED in the Defendants' favor on Ford's race discrimination claims.[13]

II.    *Age Discrimination*

Ford also asserts an ADEA claim against Wal-Mart, alleging she was unlawfully discriminated against because of her age.

"Under the ADEA, it is unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Koteras v. Briggs Equipment, Inc.*, 854 F. App'x 586, 584 (5th Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); 29 U.S.C. § 623(a)(1)) (citations omitted). As under Title VII, when a plaintiff attempts to establish an ADEA claim with circumstantial evidence, the *McDonnell Douglas* burden-shifting framework is applicable. *Id.* at 584-85 (citations omitted). However, it should be noted that, unlike Title VII, "[a]n ADEA plaintiff must show that his age was the but-for cause of his employer's adverse action." *Id.* at 584 (citing *Salazar*, 982 F.3d at 389).

Prior to doing so, the Court notes the cat's paw theory of liability issue addressed in detail above. This Court has relatively recently noted that "[t]he Fifth Circuit has never applied the cat's paw theory in an ADEA case[.]" *East v. Walgreen Co.*, 2021 WL 706761, at *3 n. 1. (N.D. Miss. Feb. 23, 2021). Although the Fifth Circuit has not explicitly sanctioned the utilization of the cat's paw theory of liability in an ADEA case since the Supreme Court's 2011 decision in *Staub*, this Court has nevertheless applied it in that context. *See, e.g., Harkness v. Bauhaus U.S.A., Inc.*, 86 F. Supp. 3d 544, 559 (N.D. Miss. 2015); *Cash*, 2020 WL 1846535 at *9. Nevertheless, for the same

---

[13] Having reached this conclusion, the Court sees no need to further address whether liability could be imputed to Wal-Mart under the cat's paw theory on these facts.

reasons articulated above in connection with Ford's race discrimination claims, the Court turns directly to the viability of her underlying claim.

The parties' arguments as to Ford's ADEA claim are largely synonymous with their arguments on her race discrimination claims. For the sake of brevity, the Court will not recite each of those arguments again nor will it fully outline the *McDonnell Douglas* framework. Rather, for the same reasons set forth above, the Court concludes that Ford can satisfy a *prima facie* case and that Wal-Mart has carried its burden of production as to its reason for the adverse employment action. The Court will therefore transition directly to the pretext analysis.

In addition to the evidence considered above—some of which (such as the comments of Gloria Moore and Tina Hannah concerning race) are not relevant to the ADEA claim, Ford testified that Wisecup made relevant comments toward her specifically concerning her age:

> **Q.** Then you go on to state in Paragraph 5, "Wisecup expressly held plaintiff's age against her." Tell me when he expressly held age against you?
>
> **A.** Okay. It was when Mr. Moore was going to retire. And they call us in the office -- they sent a memo out, because he had a memo. And all of us come in the office. It was about four of us, four or five. And he tells us that Mr. Moore was going to retire and that the old hands was holding Walmart back from changes. And he goes on to tell about a 24-year-old was going to take his place and did anybody – any other assistant know Mr. Moore. Didn't nobody raise their hand because they were all younger than us anyway. And he made the comment, "Birta, you know him." I said, "Yes, I do." And he went on to say that the older hands -- about the older hands was holding Walmart back.
>
> **Q.** Okay. And you understood that to be a reference in connection with Mr. Moore?
>
> **A.** Yes, sir.
>
> . . .

33

Q.    Okay. So what I'm trying to do, Ms. Ford, is just place a time stamp on when this conversation occurred. So, obviously, we have the e-mail. So the conversation that you're referencing that Mr. Wisecup had occurred sometime after December 14, 2018; is that accurate?

A.    Yes, sir.

Q.    Okay. Did Mr. Wisecup ever refer to you as an old hand?

A.    Well, when he asked, "Birta, how long you been here? You probably remember him." But –

Q.    Okay. That's what you can remember?

A.    Yes, sir. Yes, sir.

Q.    And so you took that to mean that Mr. Wisecup was making a negative comment about your age?

A.    Yes, sir. I do.

[39], Ex. 3 at p. 37-38.

Wal-Mart contends that those alleged comments are only stray remarks that cannot preclude summary judgment. The Fifth Circuit has articulated the following standard as it pertains to discriminatory remarks:

> A plaintiff can show pretext and discriminatory motive by pointing to age-related comments made by a person in charge of firing. A plaintiff can use these comments in both direct and indirect evidence cases. In direct evidence cases, comments must meet a demanding standard because the plaintiff relies on them to prove the entire case of discrimination. For age-related comments to show pretext in a direct evidence case, they must be more than "stray remarks." To rise above the level of a stray remark, an age-related comment must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that age was an impermissible factor in the decision to terminate the employee. . . In indirect evidence cases, courts apply a less demanding standard because the discriminatory remarks are just one ingredient in the overall evidentiary mix. . . Under this less demanding standard, the plaintiff must show that the comments involve (1) discriminatory animus (2) on the part of a person that is either primarily responsible

34

> for the challenged employment action or by a person with influence
> or leverage over the relevant decisionmaker.

*McMichael v. Transocean Offshores Deepwater Drilling, Inc.*, 934 F.3d 447, 457-58 (5th Cir. 2019) (internal citations and quotation marks omitted).

The Court turns to the comments at issue here. First, Ford alleges that Wisecup stated that the older hands were holding Wal-Mart back. And although Wisceup did not specific refer to her as an "older hand," he allegedly asked Ford how long she had been working at Wal-Mart. Ford contends that this follow-up question and the setting of the conversation as a whole implied that Wisecup was negatively referring to her age.

The Court does not wholly discount this statement. However, the Court does note that it was not a comment made specifically to her and that it requires some inference to believe that Wisecup intended it to be discriminatory toward her. Nevertheless, even viewing this evidence in the light most favorable to her, when considered in light of the minimal evidentiary support (analyzed at length above), the Court finds that she has not come forward with evidence to support her contention that her age was the but-for cause of her being impacted by the reduction in force. In fact, the Court finds that the evidence to support her age claim, taken as a whole, is weaker than the support for her race claims. At best, Ford has come forward with "scant evidence of discriminatory treatment." *Owens*. 33 F.4th at 833.

Ultimately, the Court finds that Ford's age claim must also be dismissed. Summary judgment is therefore GRANTED in Wal-Mart's favor as to that claim.

### III.    Tortious Interference with Employment

Finally, Ford asserts a tortious interference with employment claim against Wisecup. The Mississippi Supreme Court has described a plaintiff's burden to prevail on such a claim as follows:

> The four elements of tortious interference with employment are:

35

(1)     that the acts were intentional and willful;

(2)     that they were calculated to cause damage to the plaintiffs in their lawful business;

(3)     that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and

(4)     that actual damage and loss resulted.

*McClinton v. Delta Pride Catfish, Inc.*, 792 So.2d 968, 976 (Miss. 2001) (quoting *Hollywood Cemetery Ass'n v. Bd. of Mayor & Selectmen*, 760 So.2d 715, 719 (Miss. 2000)) (additional citation omitted).

To support her tortious interference with employment claim, Ford relies on the same evidence analyzed above in connection with her race and age claims.

As to the first two elements, the Court notes one of its prior cases involving Wal-Mart and the same progressive discipline plan at issue in the present case. *Morris v. Young*, 2016 WL 2354642 (N.D. Miss. May 3, 2016). In *Morris*, this Court held that "the claim of tortious interference does not require an intention to terminate, but merely an intention to *interfere* with employment . . . The decision to issue a coaching which could result in termination—and in this case did—constitutes a potentially actionable interference." *Id.* at *4 (N.D. Miss. May 3, 2016) (citing *Wertz v. Ingalls Shipbuilding Inc.*, 790 So.2d 841, 845-46 (Miss. Ct. App. 2000)) (emphasis in original). However, despite recognizing that the initiation of a disciplinary action (or coaching) *could* create an actionable basis for interference, the Court, for the same reasons articulated above in connection with Ford's previous claims, finds that she has not done so here. Specifically, she has provided no specific evidence tending to establish that Wisecup took any actions that were calculated to damage her in her employment. As noted above, she points to the disciplinary actions

36

and the performance review which occurred several months prior to the reduction in force. Nor can Ford show that Wisecup's conduct was without right or justifiable cause.[14]

Furthermore, a defendant occupying a position of responsibility on behalf of another in this context (such as Wisecup) may raise an additional defense: "one occupying a position of responsibility on behalf of another is privileged, within the scope of that responsibility and absent bad faith, to interfere with his principal's contractual relationship with a third person." *Levens v. Campbell*, 733 So.2d 753, 760 (Miss. 1999) (quoting *Shaw v. Burchfield*, 481 So.2d 247, 255 (Miss. 1985)). For the same reasons articulated above, the Court finds that Ford has not come forward with sufficient evidence to show that Wisecup acted outside the scope of his authority or in bad faith. The imposition of disciplinary actions and a poor performance review were directly within the scope of Wisecup's authority as a Store Manager. And the Court relies on its analysis above (on the race claims and the age claim) for the conclusion that there is insufficient evidence to show that Wisecup acted in bad faith.

Summary judgment is hereby GRANTED in Wisecup's favor on Ford's tortious interference claim.

---

[14] In reaching this conclusion, the Court reiterates its analysis above regarding Wisecup's initiation of the disciplinary actions and the poor performance review, as well as Ford's contention that the same was not warranted. As noted above, the Court finds Ford's opposition to those disciplinary actions and the poor performance review to be *mere disputes*. By that same token, the Court finds that Ford cannot show that Wisecup's conduct was taken without right or justifiable cause.

*Conclusion*

The Court has carefully considered the record as a whole, as well as the parties' arguments. Any arguments not specifically addressed herein (including any of the 29 reasons which Ford contends support her pretext argument) would not have changed the outcome in this case. For the reasons set forth above, the Defendants' Motion for Summary Judgment [39] is GRANTED. Ford's claims are hereby dismissed *with prejudice*. A Final Judgment consistent with this Order and Memorandum Opinion will issue this day.

SO ORDERED, this the 1st day of August, 2022.


/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE